# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| | § | |
| V. | § | CASE NO. 4:09-CR-153 |
| | § | Judge Crone |
| ADRIAN HINOJOSA (2) | § | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Pending before the Court is Defendant's Motion to Suppress (Dkt. #67). Having considered the relevant pleadings, and argument and testimony given at the January 25, 2010 hearing, the Court is of the opinion that Defendant's motion should be denied.

### BACKGROUND

Defendant is charged with Conspiracy to Possess with the Intent to Manufacture and Distribute Methamphetamine in violation of 21 U.S.C. § 846. Defendant moves to suppress all evidence and statements obtained as a result of a traffic stop on June 4, 2009. The Government and Defendant offered testimony and argument at the January 25, 2010 hearing.

*Officer Tinajero*

The Government offered the testimony of Officer Jorge Tinajero ("Tinajero") of the Dallas Police Department. On the evening of June 4, 2009, Tinajero was out on patrol with his partner Officer Rene Sanchez ("Sanchez") of the Dallas Police Department. The officers received a call from Corporal Oscar Carrasco ("Carrasco") of the Dallas Police Department. Carrasco told the officers that a light colored Infiniti was driving fast through the area and that they should stop and

ID this vehicle and the driver.[1] Carrasco told the officers to watch for a traffic violation and then pull over the vehicle. The officers located the vehicle soon after talking to Carrasco. The Infiniti was driving at a high rate of speed, well over the posted speed limit. The Infiniti passed another vehicle without signaling lane changes and failed to stop at a stop sign. Tinajero and Sanchez decided to pull over the Infiniti based on these traffic violations. Tinajero turned on the lights to their patrol car and the Infiniti pulled over to the side of the road.

Tinajero approached the driver's side of the car and asked the driver for his license and insurance. The driver was Defendant. Tinajero ran Defendant's license number through a database and his name turned up a warrant hit. However, one of the numbers on the warrant was different by one digit than the information given to him by Defendant. Tinajero asked Defendant about the warrant and Defendant told him that a friend of his used his name and that the warrant was not for him. Tinajero believed that the warrant might be valid because the name on the warrant matched Defendant's. Further, Tinajero thought there might just be a typo in the numbers. Tinajero wanted to know who the friend was and generally wanted to know more information about this warrant. Therefore, he asked Defendant to get out of the vehicle and talk to him about the warrant. Defendant opened the driver's side door and started to put one foot out of the vehicle. Suddenly, Defendant put the car in gear and sped off. Tinajero and Sanchez avoided the vehicle and Tinajero called Dallas Police dispatch to report a vehicle leaving a traffic stop. Tinajero and Sanchez got in their car and attempted to follow Defendant, but lost track of where Defendant went in the Infiniti. Sanchez told Tinajero that he had seen what he believed to be a plastic bag fly out of Defendant's passenger

---

[1] Officer Tinajero testified that prior to stopping Defendant's vehicle, he did not know Defendant's identity, did not know that he was part of a DEA investigation, and did not know that DEA was conducting surveillance on Defendant that night.

2

window, so the officers returned to the area where the bag was believed to be located. They located the bag and the bag contained what was identified by field testing to be methamphetamine.

Tinajero did not see Defendant again until a short while later when Defendant was arrested by other officers at a nearby residence. Defendant was placed in Tinajero's vehicle to be transported to police headquarters where he would be interviewed. While Defendant was in Tinajero's vehicle, Tinajero asked Defendant for general biographical information needed for the booking process. Without being asked, Defendant stated that he had information on cartels and information involving drug trafficking. Neither Tinajero nor Sanchez asked Defendant for this information and they did not ask Defendant anything about these statements. Tinajero did not witness the arrest of Defendant, but stated that Sanchez participated in the arrest by taking custody of Defendant and placing him in their patrol vehicle. Tinajero saw no visible injuries on Defendant's body, observed no torn clothing, and Defendant did not make any complaints to indicate otherwise.

*Officer Sanchez*

The Government offered the testimony of Officer Rene Sanchez of the Dallas Police Department. On June 4, 2009, Sanchez was out on patrol with his partner Tinajero. Sanchez stated that Carrasco told the officers to be on the lookout for the light colored Infiniti. Not long after this call, Sanchez and Tinajero located the Infiniti. Sanchez observed the vehicle driving at a high rate of speed, moving around a vehicle without using signals, and failing to stop at a stop sign. He felt all of these infractions were grounds to arrest the driver. The officers turned on their vehicle lights and pulled over the Infiniti, which was driven by Defendant. Sanchez did not speak to Defendant, Tinajero did. Tinajero went to the patrol car to run a check on Defendant's license and proof of insurance. Tinajero informed him that there was a possible warrant for Defendant. When Tinajero

3

began to question Defendant about the warrant, Defendant acted like he was going to get out of the vehicle, but then drove away at a high rate of speed. Sanchez observed what he believed to be a bag fly out of the passenger side window of Defendant's vehicle. The officers ran back to their vehicle to report that Defendant had fled the traffic stop. They drove about a half mile, but could not locate Defendant's vehicle, so they went to look for the bag. Sanchez located the bag on the ground. Inside the bag was a Tupperware container that held what proved to be methamphetamine.

Not long after the traffic stop, Sanchez saw Defendant at a nearby residence. Other officers had placed Defendant under arrest. Sanchez did not participate in the arrest. Tinajero went to park the car and Sanchez walked up to where Defendant was being held by other officers and took custody of Defendant, placing him in the back of his patrol car. He and Tinajero transported Defendant to police headquarters upon the direction of Carrasco. He did not observe any injuries on Defendant's person and Defendant did not complain about any injuries.

*Corporal Carrasco*

The Government offered the testimony of Corporal Oscar Carrasco of the Dallas Police Department. Carrasco first made contact with Defendant at the scene of his arrest. Carrasco was out on surveillance the night of June 4, 2009, in conjunction with a narcotics investigation being conducted by DEA. Defendant was one of the suspects upon whom DEA was conducting surveillance. DEA requested that Carrasco have Dallas Police follow Defendant's speeding car and stop Defendant for any traffic violations they may observe. Carrasco made this request to Sanchez and Tinajero. He did not see any of the traffic violations or the subsequent stop of Defendant's vehicle. Defendant was later arrested after fleeing the traffic stop. Carrasco read Defendant his Miranda rights from the Dallas Police Department Miranda Warning card, which Defendant signed.

4

Tinajero and Sanchez transported Defendant to Dallas Police Department headquarters. Upon arrival, Defendant was interviewed by Special Agent Tahariiq Gray ("Gray") and Special Agent Paul Maurizio ("Maurizio") of DEA. Carrasco did not participate in the interview of Defendant. Defendant asked Carrasco for a cup of water and Carrasco gave him a cup of water. Carrasco did not recall Defendant ever requesting to use the restroom, but did recall that when Defendant left the interview room, the cup of water was full of urine. Carrasco did not observe any injuries to Defendant and Defendant did not complain about any injuries. Carrasco did not observe any threats of coercion and did not observe any promises being made to Defendant in exchange for information.

*Officer Carey*

The Government offered the testimony of Officer Jeff Carey of the Lewisville Police Departement, who is assigned to DEA. Carey was out on surveillance the night of June 4, 2009, in conjunction with a narcotics investigation being conducted by DEA. Carey arrived at a residence located on Grayson Drive and observed a light colored Infiniti, driven by Defendant, leaving the residence. Carey followed Defendant to another residence on Wynnewood. After a short time, Defendant left the Wynnewood address traveling at a high rate of speed. Gray told Carey that he wanted the vehicle stopped for traffic violations, so Carey followed the Infiniti in his own vehicle. Officers from the Dallas Police Department pulled over the Infiniti. Carey and Gray observed the traffic stop from their own vehicles. Suddenly, Defendant's Infiniti pulled away from the traffic stop traveling at a high rate of speed. Gray instructed Carey to return to the Grayson Drive address in case Defendant returned to the residence.

As Carey arrived at the Grayson Drive residence, he noticed tail lights of a vehicle pulling into the garage. He identified the vehicle as the Infiniti driven by Defendant. Carey approached the

garage on foot. Defendant got out of his vehicle and began to leave the garage. At that time, Carey drew his service weapon, identified himself, and told Defendant to get on the ground. Defendant repeatedly said, "are you robbing me?" and would not get on the ground. Defendant began to move to his left toward the front door of the house, despite Carey instructing him to get on the ground. Carey moved in closer to Defendant, grabbed Defendant's tank top and forced Defendant to lay on the ground. Carey then restrained Defendant, and other officers arrived almost simultaneously and put Defendant in handcuffs. Carey believes he used the proper amount of force necessary. Carey had no further contact with Defendant. Carey observed no injuries to Defendant and Defendant complained of no injuries or abuse.

*Special Agent Maurizio*

The Government offered the testimony of Special Agent Paul Maurizio of DEA. On June 4, 2009, Maurizio participated in the surveillance of a suspected drug trafficking ring. Maurizio's first contact with Defendant came at Defendant's residence after Defendant fled the scene of a traffic stop made by the Dallas Police Department. Officers believed that Defendant was involved in drug trafficking. When Maurizio arrived at Defendant's residence, Carey was placing Defendant under arrest. He assisted in placing handcuffs on Defendant. Maurizio took custody of a bag containing methamphetamine that Sanchez told him was thrown from Defendant's car window when Defendant left the traffic stop. Maurizio took still photographs at the scene of Defendant's arrest.

Maurizio and Gray interviewed Defendant at Dallas Police headquarters. Carrasco read Defendant his rights and Defendant signed a card acknowledging that he understood his Miranda rights. Defendant told them that he received the methamphetamine from "David" at a CVS pharmacy. He stated that the methamphetamine was for "George." Gray determined that Defendant

6

was not being truthful with the officers and they stopped the interview. Maurizio did not observe any physical injury to Defendant and Defendant did not complain of any injuries. At no point during the interview did Defendant request an attorney, ask to use the restroom, or ask for water. Maurizio believes Defendant made statements to law enforcement freely and voluntarily and was not coerced or given any promises in exchange for information.

*Special Agent Gray*

The Government offered the testimony of Special Agent Tahariiq Gray of DEA. Gray stated that he is the case agent for the investigation of a drug trafficking ring in which Defendant is a suspect. As part of this investigation, on June 4, 2009, Gray and other officers in his group were monitoring phone calls between Mauricio Becerra ("Becerra") and Johnny Lopez ("Lopez"). Lopez also goes by "George." Becerra and Lopez arranged for the sale of approximately one pound of methamphetamine. Lopez was not in the area to do the deal, so Lopez stated that a friend of his, later identified as Defendant, would meet Becerra at Lopez's mother's house to pick up the methamphetamine from Becerra. Gray instructed some officers to put surveillance on Defendant's home on Grayson and instructed other officers to place surveillance on Lopez's mother's residence on Wynnewood. Officers identified Becerra's vehicle and followed Becerra as he drove to the Wynnewood residence. Officers identified Defendant's Infiniti at the Grayson residence and followed Defendant as he traveled to the Wynnewood address. Defendant got out of the Infiniti, approached Becerra's vehicle, and then returned to the Infiniti. Gray and the other officers could not be certain if the suspected narcotics transaction had occurred because it was very dark in front of the house.

Defendant left the Wynnewood residence at a high rate of speed. Gray called Carrasco and

7

asked him to have uniformed Dallas Police officers pull over the Infiniti for any traffic violations. The officers were to develop their own probable cause to pull over Defendant's vehicle. Defendant's vehicle pulled behind Gray's vehicle and then passed him on the driver's side while driving at a high rate of speed without using any traffic signals. A Dallas Police Department vehicle followed Defendant's car. Gray was informed that Dallas Police had pulled over Defendant further up the road, but that when they inquired about an outstanding warrant, Defendant had fled the scene. Gray was told that Defendant threw an object out the window of his car, which was believed to contain methamphetamine.

Gray and Maurizio interviewed Defendant at Dallas Police headquarters after Carrasco read Defendant his Miranda Warnings. Neither Gray nor Maurizio identified themselves as DEA agents. Defendant told them that he had purchased the methamphetamine from "David" at a CVS parking lot. Gray knew that this was not true due to the information officers obtained through the wire tap and surveillance of Defendant meeting Becerra at the Wynnewood address. Defendant would not identify a photograph of Lopez. Gray decided that because Defendant was being untruthful and not fully cooperative, the interview should be discontinued. The officers placed Defendant in the custody of the Dallas Police Department. Defendant made no requests to use the restroom, and Gray did not observe Defendant urinating in a cup. Gray observed no physical injuries or abuse to Defendant and Defendant did not complain of physical injuries or abuse. Defendant was advised of his rights and spoke with officers freely and voluntarily. Defendant was not coerced in any way. Defendant was not promised anything in exchange for providing statements.

*Anita Hinojosa*

Defendant offered the testimony of Anita Hinojosa, Defendant's mother. Defendant was in

8

a car accident during the summer of 2008 where he sustained a broken jaw and was hospitalized. Defendant was arrested on June 2, 2009, and also on June 4, 2009. Defendant's mug shot taken on June 5, 2009, shows injuries to Defendant's right ear, right cheek, and his eyes. She visited Defendant in jail and he appeared to look worse than the mug shots represent. At a later date, she took possession of Defendant's shirt that he was wearing during the June 4, 2009 arrest. The shirt had some blood stains on it and was torn. She did not make any attempts to report Defendant's injuries or complain of possible abuse. Defendant has been arrested before and knows his Constitutional rights.

*Adrian Hinojosa*

At the hearing, the Court advised Defendant of his right not to testify; however, Defendant chose to testify on his own behalf. Defendant stated that Carey did not identify himself and was not wearing a police uniform, so Defendant believed he was being robbed. He tried to move toward the front door of his house in order to get into the light so he could see who was holding a gun on him. Carey grabbed him by the shirt and dragged him to the ground. Once other officers arrived, he understood that he was being arrested. Defendant suffered an injury to his ear, his ribs were bruised, and he suffered a scratch on his face due to excessive force being used by law enforcement officers. One officer put his thumb underneath Defendant's jaw, which was broken in a car accident the previous summer. This officer used vulgar language and said, "I'll show you not to run from the police." He was in fear of serious bodily injury.

Defendant was interviewed by Gray and Maurizio. Carrasco read him his Miranda rights and Defendant signed something stating that he understood his rights. Defendant asked Carrasco for a cup of water and Carrasco provided a cup of water. Many times during the interview Defendant

9

requested to use the restroom because he was on prescription cold medication that caused him to need to use the bathroom frequently. None of the officers would let him use the restroom so he urinated in the water cup and used one of his socks to remove diarrhea from his body. During the interview Defendant asked to go home, and Gray responded, "I'll be going home, but we'll see if you'll be going home." Defendant felt that this was a promise to let him go in exchange for information. Defendant agreed that this was his interpretation of what Gray said and that Gray did not explicitly promise to release him. Gray and Maurizio did not abuse him at any time.

Regarding Defendant's injuries, he told a nurse that he believed his ear was broken, but she told him it was only bruised and gave him pain medication. When he was being processed into the jail he complained about his injuries during a medical exam, but the officer doing the processing told him it was nothing.

Defendant states that he did not tell Gray and Maurizio the truth about where he obtained the methamphetamine. Defendant stated that he was in possession of methamphetamine on June 4, 2009. He was read his rights and understood them, but did not make the statements freely and voluntarily because he was afraid that officers would injure him further. Defendant stated that he was arrested on June 2, 2009, for possessing a handgun, which violated his parole agreement on an earlier state charge.

## ANALYSIS

Defendant argues that the stop of his vehicle by Dallas Police Department officers was illegal because it was made "without a valid warrant, probable cause or exigent circumstances." Defendant argues that officers acted on "suspicion only" based upon "their knowledge of the federal investigation and the alleged events of that night." Further, Defendant argues that his statements

made following his arrest must be suppressed as they were involuntary and "made while under coercion and threats." Based on these arguments, Defendant urges that all evidence and statements made in connection with his June 4, 2009 arrest be suppressed.

The Government argues that the stop of Defendant's vehicle was lawful, because officers had both probable cause and reasonable suspicion, based on their own observations, to believe that Defendant had committed several traffic infractions in violation of the Texas Transportation Code. The Government argues that after the proper stop of Defendant's vehicle, Defendant was lawfully arrested for possession of a controlled substance and evading arrest. Further, the Government argues that Defendant made any and all statements to law enforcement officers voluntarily, knowingly and intelligently. Based on these arguments, the Government urges that Defendant's motion to suppress evidence be denied.

***The Stop of Defendant's Vehicle***

The Fourth Amendment protects individuals "against unreasonable searches and seizures." Const. amend. IV. Traffic stops are deemed seizures for the purposes of the Fourth Amendment. *United States v. Lopez*, 420 F.3d 420, 430 (5th Cir. 2005)(citing *United States v. Valdez*, 267 F.3d 395, 397 (5th Cir. 2001)). In analyzing the legality of a traffic stop, the Court must "ask whether the officer's action was: (1) 'justified at its inception'; and (2) 'reasonably related in scope to the circumstances which justified the inference in the first place.'" *Lopez*, 420 F.3d at 430 (citing *United States v. Terry*, 392 U.S. 1, 19-20 (1968)).

For a traffic stop to be lawful at its inception, "an officer must have an objectively reasonable suspicion that some sort of illegal activity, *such as a traffic violation*, occurred, or is about to occur, before stopping the vehicle." *Lopez*, 420 F.3d at 430 (citations omitted)(emphasis added). "In the

11

course of effectuating the stop, a police officer may permissibly examine the driver's license and registration and run a computer check on them to investigate whether the driver has any outstanding warrants and if the vehicle is stolen." *Lopez*, 420 F.3d at 430 (citing *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004)). The officer's questions do not need to relate to the purpose of the traffic stop. *Id*. "[O]nce all relevant computer checks have come back clean, there is no more reasonable suspicion, and, as a general matter, continued questioning thereafter unconstitutionally prolongs detention." *Id*. [I]f additional reasonable suspicion in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed." *Id*.

The Court finds that Officers Tinajero and Sanchez had reasonable suspicion to pull over Defendant's vehicle. The officers observed Defendant's vehicle driving in excess of the posted speed limit, Defendant passed a vehicle without signaling his intent to change lanes, and Defendant failed to stop at a stop sign. In fact, the officers not only had a reasonable suspicion to believe Defendant was committing traffic violations, they also had probable cause. *See United States v. Shabazz*, 993 F.2d 431, 434-35 (5th Cir. 1993) (officers had more than a reasonable suspicion to stop a vehicle after observing actual traffic offenses). Therefore, Officers Tinajero and Sanchez had probable cause to believe Defendant had committed a traffic offense and stopping his vehicle was lawful. After a computer check of Defendant's records showed an outstanding warrant in Defendant's name, Officer Tinajero had reasonable suspicion to further detain Defendant and inquire about the warrant. When Defendant decided to leave the traffic stop, and an officer witnessed Defendant throwing an object out of the window of his car, which proved to contain methamphetamine, the officers had probable cause to arrest Defendant for evading arrest and

possession of a controlled substance. Based on the foregoing, the Court finds that the stop of Defendant's vehicle and his subsequent arrest were lawful.

The Government has satisfied its burden of showing that officers had reasonable suspicion to stop Defendant's vehicle. Therefore, there is no basis for suppression.

***Statements Made by Defendant***

In *Miranda v. Arizona*, the Supreme Court concluded that the possibility of coercion inherent in custodial interrogations raises the risk that a suspect's right against self-incrimination might be violated. *Miranda v. Arizona*, 384 U.S. 436, 467 (1966). To protect against this danger, *Miranda* creates a presumption that a confession given during a custodial interrogation is coerced, in the absence of specific warnings. *United States v. Patone*, 542 U.S. 630, 639 (2004). A suspect may waive his right to remain silent, but the waiver must be made voluntarily, knowingly, and intelligently. *Miranda*, 384 U.S. at 444.

The inquiry whether a valid waiver of *Miranda* warnings has occurred has two elements. *United States v. Cardenas*, 410 F.3d 287, 293 (5th Cir. 2005)(citing *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception." *Id*. "Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id*. A statement is voluntary if, under the totality of the circumstances, the statement is the product of the accused's free and rational choice. *United States v. Scurlock*, 52 F.3d 531, 536 (5th Cir. 1995). The Government has the burden of showing by a preponderance of the evidence that the statements were voluntarily made. *Id*.

After considering the pleadings and the testimony presented at the hearing, the Court finds

that the Government has carried its burden. Defendant made a knowing and voluntary waiver of his Miranda rights and was not coerced or threatened by law enforcement officers to do so. The Defendant testified that he was read and understood his rights. Defendant was read his rights by Corporal Carrasco from a Dallas Police Department Miranda Warning card. Defendant read the card and signed the card. Further, Defendant's inference that the alleged statement by Agent Gray was a promise used to convince him to waive his rights is unfounded. Even if Agent Gray actually stated, "I'll be going home, but we'll see if you'll be going home," an indication by law enforcement that Defendant could somehow help his case by cooperating is simply not sufficient to show that Defendant did not act under his own free and informed will. *See United States v. Broussard*, 80 F.3d 1025, 1034 (5th Cir. 1996)(concluding that an agreement that the United States Attorney would be apprised of a defendant's cooperation, coupled with an express admonition that a defendant would still go to prison, does not constitute a promise of leniency); *see also United States v. Ballard*, 586 F.2d 1060, 1063 (5th Cir. 1978)(concluding that a statement that the accused's cooperation will be made known to the court is an insufficient inducement to render subsequent confession involuntary); *United States v. Ornelas-Rodriguez*, 12 F.3d 1339, 1348 (5th Cir. 1994)(advising accused that there are advantages to cooperating does not render a confession involuntary).

The testimony given by the Government witnesses outweighs the completely contradictory testimony given by Defendant. As the burden is a preponderance of the evidence, the question is whether or not it is probably true that the Defendant was extended his *Miranda* warnings and knowledgeably and voluntarily waived them. In viewing the testimony, the Court finds that the Government witnesses are more credible than Defendant. By Defendant's own admission, he understands *Miranda* warnings. Defendant claims that he made statements to law enforcement

14

because he had been physically injured, feared further injury, and was denied use of restroom facilities. However, none of the Government witnesses observed any physical injury or abuse and reported no complaints made by defendant. Defendant did not file any type of complaint with the Dallas Police Department, the jail, or DEA. Defendant admitted that he was in possession of methamphetamine and that he evaded arrest. Further, Defendant stated that he violated the terms of his parole in state court by being arrested for possession of a firearm only two days earlier. Based on a preponderance of the evidence, the Court did not hear circumstances that convinced it that the Defendant's free will was jeopardized in any way, that any promises were made to the Defendant, or that Defendant was abused or coerced into making statements.

The Government has satisfied its burden of showing that Defendant knowingly and voluntarily waived his rights prior to making the statements he seeks to suppress. Therefore, there is no basis for suppression.

## RECOMMENDATION

The Court recommends that Defendant's Motion to Suppress should be DENIED.

Upon agreement of the parties, within five (5) days after service of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(c).

Failure to file written objections to the proposed findings and recommendations contained in this report within five days after service shall bar an aggrieved party from *de novo* review by the district court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the district court except on grounds of plain error or manifest injustice. *Thomas v. Arn*, 474 U.S. 140, 148 (1985); *Rodriguez v. Bowen*, 857 F.2d 275, 276-77 (5th

Cir. 1988).

**SIGNED this 29th day of January, 2010.**

_____
AMOS L. MAZZANT
UNITED STATES MAGISTRATE JUDGE